Harold H. STRAUSS and V. Marguerite Strauss, d/b/a St. Lucie Skyways, Plaintiff,

v.

DECATUR PARK DISTRICT, a Municipal Corporation, Defendant.

Civ. A. No. 2658.

United States District Court
S. D. Illinois, S. D.
Oct. 29, 1959.

Garman & Owen, Decatur, Ill., for plaintiffs.

LeForgee, Samuels, Miller, Schroeder & Jackson, Decatur, Ill., Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for defendant.

POOS, District Judge.

Harold H. Strauss and V. Marguerite Strauss, d/b/a St. Lucie Skyways, plaintiffs, filed this suit against Decatur Park District, a municipal corporation, to recover for the destruction of a Cessna 182 airplane which was destroyed by fire on January 22, 1959. The defendant, on and prior to this date, operated the Decatur Airport at Decatur, Illinois, and the plaintiffs on the above date delivered

882

the aircraft to defendant to be safely kept at a hangar owned and operated by it. The complaint alleges that defendant accepted delivery of the aircraft and stored the same in said hangar, and that defendant also agreed to return the aircraft upon demand, in return for which the plaintiffs agreed to pay the usual and customary charge for the services rendered; that in violation of the agreement and without fault on plaintiff's part, defendant wholly neglected and omitted to properly store and preserve the aircraft, but negligently placed it in a place where it was destroyed by fire on said date. The value of the plane was alleged to be $13,655.20.

The defendant moves to dismiss the action on two grounds, viz.:

(1) Because the complaint fails to state a claim against the defendant upon which relief can be granted, and

(2) Because the defendant is a municipal corporation and is therefore immune to the purported cause of action.

The defendant municipal corporation is organized and created under "The Park District Code" of Illinois. The Act creating this district became effective July 8, 1947, as amended by Act approved May 17, 1951. Ill.Rev.Stat., Ch. 105, Secs. 1–1 to 12.1–1. The Supreme Court of Illinois has held the Act constitutional. People ex rel. Honefenger v. Burris, 408 Ill. 68, 95 N.E.2d 882; People ex rel. A. C. Ammann v. Wabash Railroad Company, 391 Ill. 200, 62 N.E.2d 819.

Section 8–1 of the Act provides for the General Corporate Powers and Section 8–4 provides as follows:

"All park districts shall retain and be vested with all power and authority contained in * * * 'An Act authorizing park commissioners to acquire or provide sites for armories for the National Guard and to acquire or establish and to maintain landing fields for aircraft'."

This Section gives Park Districts the power to acquire lands for the establishment and maintenance of landing fields, and Section 9–2, Ch. 105, Ill.Rev.Stat.

spells out the authority in the following language:

"9–2. Every park district is authorized to acquire by purchase or condemnation under power of eminent domain, or lease, real estate, in whole or in part, either within or without the corporate limits of said park district for the purpose of establishing for said district an airport and landing field for aircraft, and to provide hangars, shops, and other necessary equipment and appurtenances therefor usually incident to the operation of an airport, and to maintain and operate the same."

Sections 9–2a and 9–2b provide for taxation, and the issuance of bonds to provide funds for the purposes aforesaid.

A careful reading of the Park Code discloses that it was the intent of the General Assembly of Illinois that a park district was to be a governmental body in the exercise of all its functions, and that the purpose of the General Assembly to place governmental power in park districts was to create the right to acquire and operate, among other things, an airport.

The question presented by the motion to dismiss is whether or not this defendant, a governmental body, is liable for negligence of its employees under the doctrine of *respondeat superior* for the loss by fire of the aircraft in question. The plaintiffs seek to avoid this on their theory that the action sounds in contract. To quote the plaintiffs, they say that this is not an "action in tort for negligence", but is an action for breach of contract. The plaintiffs do not and cannot deny that their complaint alleges "that in violation of said agreement and without fault on the part of the plaintiffs, the defendant wholly neglected and omitted to properly store and preserve said aircraft, but negligently placed it in a place where it was destroyed by fire". In so doing the plaintiffs seek to equate "tort" and "negligence" even though the former is a much broader term than the latter. Whether or not the action is labeled

"tort" or "contract", it is still based on negligence, and park districts such as created by the Park Code are immune from liability for negligence.

The Courts of Illinois and other states have specifically rejected attempts to circumvent the doctrine of immunity by altering the form of action so as to make it sound in contract, when in fact the only basis for holding the one enjoying immunity responsible is the negligent act or acts of its employees. This is true in charitable trusts as well as municipal corporations in the exercise of governmental functions. This immunity was written into the law of Illinois long prior to the passage of the Park Code.

In Wattman v. St. Luke's Hospital Association, 314 Ill.App. 244, 41 N.E.2d 314, an action was brought against a hospital which at the time enjoyed charitable immunity. The complaint consisted of two counts. One was for wrongful death. The other was based upon a violation of an alleged contractual relationship whereby the hospital impliedly promised not to injure the plaintiff through negligent acts of its employees. The first count was dismissed as sounding purely in tort, being therefore barred by the doctrine of charitable immunity as announced in Parks v. Northwestern University, 218 Ill. 381, 75 N.E. 991, 2 L.R.A.,N.S., 556. The second count was also dismissed. In sustaining the dismissal of the second count, the Illinois Appellate Court stated, 314 Ill.App. at page 260, 41 N.E.2d at page 321:

"In the case at bar, plaintiff bases her action against the hospital corporation upon the negligence of the servants of such hospital. Section 31 of the Civil Practice Act, Ill.Rev. Stat.1941, c. 110, § 155, states that neither the names theretofore used to distinguish the different ordinary actions at law, nor any formal requisites theretofore appertaining to the manner of pleading such actions shall thereafter be deemed necessary or appropriate, and that the pleadings shall contain a plain and concise statement of the pleader's cause of action. If we adopted plaintiff's theory as to the action against the hospital corporation, all that would be necessary in order to overcome the rule laid down in the Parks case, would be to change the form of action from tort to contract. The Armstrong case [Armstrong v. Wesley Hospital, 170 Ill.App. 81] on which plaintiff relies, carefully points out that if the plaintiff's allegations were true, she was entitled to recover in assumpsit 'at least the money paid by her to defendant and possibly whatever damages for the breach of the contract may be capable of exact proof'. We have examined the abstract and briefs in the Armstrong case and find that there plaintiff relied on two counts, each based on a contract. In her brief Mrs. Armstrong said: 'The plaintiff seeks to recover from the Wesley Hospital for the breach of two simple contracts. These contracts are set out in a declaration containing two counts. The evidence shows that the breach of these contracts was accompanied by some negligence; that the action is based on the rights of the plaintiff under these contracts and not upon the negligence accompanying the breach of the contracts.' An examination of the authorities satisfies us that a charitable institution such as St. Luke's Hospital, is necessarily competent to contract in order to carry out the purpose for which it was incorporated and may be sued for breach of such contracts. We are convinced, that the doctrine of respondeat superior does not extend to such institutions. The rule followed in the Armstrong and the Ward cases would inevitably abrogate the doctrine announced in the Parks case that a charitable trust is excepted from the rule of respondeat superior. In the Parks case, 121 Ill. App. 512, 517, the Appellate Court said:

" 'It is further urged that the plaintiff was a student for hire, and that the defendant is authorized to charge and receive tuition by its charter. Therefore, when the plaintiff was admitted as a student and paid his tuition, a contract existed between the plaintiff and defendant in which the defendant assumed precisely the obligations and incurred precisely the same liability an individual would have incurred under a like contract. We are of the opinion that the fact that the plaintiff was required to and did pay tuition for the instruction and benefits offered by the defendant, does not deprive the defendant of its eleemosynary character. The amounts thus received from plaintiff and other students are not for private gain, but contribute to the funds of the institution and enable it more effectually to accomplish the purposes for which it was founded and organized. The fact that the defendant received from the plaintiff and other students tuition, does not make it the less a public charity, nor does it expose the trust fund to the liability of being depleted or frittered away by the negligence of its officers, professors or employees. In case of injury the wrong-doer, not the trust fund, must respond.'

"We are of the opinion that the complaint in the instant case does not state a cause of action against the St. Luke's Hospital Association under either count."

Rudy v. Lakeside Hospital, 115 Ohio St. 539, 155 N.E. 126, a bailment case very similar to the one at bar, is in accord with the reasoning of the Wattman case. In the Rudy case, a patient, upon arrival at the defendant's hospital, turned over some valuable jewelry to a hospital employee for safekeeping. The hospital employee subsequently delivered the jewelry to an imposter posing as the plaintiff's son-in-law. The defendant obtained a judgment on the pleadings.

In sustaining that judgment the Ohio court stated, 155 N.E. at page 126:

"In her statement of claim the plaintiff relied upon an implied contract by way of bailment as a predicate for recovery. It contained no specific allegations of negligence, and it is contended that she had the right to sue either in tort for a negligent delivery, or for a breach of the bailment contract.

"If this were a case of contract, purely not one involving wrongful conduct on the part of the institution's employee, liability might attach. But this case presents a different aspect and is based upon an unauthorized and negligent delivery to an imposter.

\*    \*    \*    \*    \*    \*

"Under the theory of nonliability of charitable institutions adopted by this court, as heretofore indicated, we are unable to make any distinction between cases involving damages to the person of a patient and damages to his property, where such are caused by the wrongful act of an employee. We therefore affirm the judgment of the Court of Appeals.
\*   \*   \*"

In Van Gilder v. City of Morgantown, 136 W.Va. 831, 68 S.E.2d 746, the West Virginia court held that governmental immunity extended to and covered bailments. An action was brought to recover the value of an airplane destroyed by a fire in the hangar at a municipal airport operated by the city. The airplane was stored in the hangar at a monthly rental of $15. The court held that although a good cause of action was stated for breach of a contract of bailment, still governmental immunity controlled and no action could be maintained against the defendant. Beginning at page 750 of 68 S.E.2d, the court stated:

"We fully realize that considered segregated from the general legislative purpose of encouraging and promoting the development of aviation in West Virginia and viewed

alone, it would seem a far cry to say that the rental by the City of Morgantown to L. J. Van Gilder of space for his airplane for $15.00 per month amounts to the exercise of its sovereignty by the State of West Virginia. When we consider that liability in connection with the operation of an airport might result in the obliteration financially of many of our smaller cities and that that fact would prevent other small cities from embarking upon an enterprise in which the public good is involved, the fact that the development of aviation had prompted the Legislature to extend the State's immunity becomes more apparent. This case could impair the financial existence of the City of Morgantown if based upon a general catastrophe. Fortunately it does not. The principle is the same.

"For the foregoing reasons our reply to the certified questions is: (1) The declaration does state a good cause of action for the breach of a contract of bailment for hire; (2) improperly propounded and hence not answered; (3) the Morgantown Municipal Airport, as shown by the allegations of defendant's Special plea and Statement of Defense No. 1 was, at the date of the injury complained of, being operated by the City of Morgantown in the performance of a governmental function under the provisions of Section 10 of Chapter 12 of the Acts of 1947, and therefore the immunity of the State of West Virginia from being made a defendant in any court of law or equity covers its conduct in such operation."

In City of Corsicana v. Wren, 317 S.W.2d 516, the Texas Supreme Court applied the doctrine of governmental immunity to bar an action brought for damages to an airplane stored at a city airport under a contractual arrangement resulting from a fire allegedly caused by the negligence of the city employee.

The Fifth Circuit Court of Appeals in Imperial Production Corp. v. City of Sweetwater, 210 F.2d 917, a decision similar to that of the City of Corsicana case, held the doctrine of sovereign immunity exempted the city from liability for damages to an airplane stored at the municipal airport resulting from a fire.

The common law rule is set out fully in the following cases: Le Pitre v. Chicago Park District, 374 Ill. 184, 29 N.E.2d 81; List v. O'Connor, 21 Ill.App.2d 399, 158 N.E.2d 103; Wiles v. Association of Commerce of Decatur, 332 Ill.App. 375, 75 N.E.2d 526; Griffin v. City of Chicago, 317 Ill.App. 368, 45 N.E.2d 890; Love v. Glencoe Park District, 270 Ill. App. 117; Hendricks v. Urbana Park District, 265 Ill.App. 102.

Hendricks v. Urbana Park District was an action for damages due to the death of the plaintiff's intestate while using a Park District swimming pool. The court held the Park District not liable and quoted with approval the following language from Wilcox v. City of Chicago, 107 Ill. 334;

" 'The exemption from liability is placed upon the ground that the service is performed by the corporation in obedience to an act of the legislature,—is one in which the corporation has no particular interest, and from which it derives no special benefit in its corporate capacity; that the members of the fire department, although appointed by the city corporation, are not the agents and servants of the city, for whose conduct it is liable, but they act rather as officers of the city, charged with a public service, for whose negligence in the discharge of official duty no action lies against the city without being expressly given, and the maxim *respondeat superior* has, therefore, no application.'

"The court further states:

" 'In favor of the doctrine, it may be that an additional, if not more satisfactory, reason for its adoption and rendering it an exception to the

general rule may be found in public policy. If liable for neglect in this case, the city must be held liable for every neglect of that department, and every employee connected with it, when acting within the line of duty. It would subject the city to the opinions of witnesses and jurors whether sufficient dispatch was used in reaching the fire after the alarm was given; whether the employees had used the requisite skill for its extinguishment; whether a sufficient force had been provided to secure safety; whether the city had provided proper engines and other appliances to answer the demands of the hazards of fire in the city; and many other things might be named that would form the subject of legal controversy. To permit recoveries to be had for all such and other acts would virtually render the city an insurer of every person's property within the limits of its jurisdiction. It would assuredly become too burthensome to be borne by the people of any large city, where loss by fire is annually counted by the hundreds of thousands, if not by the millions. When the excitement is over and calm reason assumes its sway, it may appear to many where other methods could have been adopted to stay destruction, that appear plausible as theories, and their utter fallacy cannot be demonstrated by any actual test. To allow recoveries for the negligence of the fire department would almost certainly subject property holders to as great, if not greater, burthens than are suffered from the damages from fire. Sound public policy would forbid it, if it was not prohibited by authority.'" At pages 109–111.

In Love v. Glencoe Park District, 270 Ill.App. 117, an action for damages for a death due to drowning, allegedly caused by the negligence of the Park District, it was held that the Park District was not liable. The court said (at page 119):

"The only question presented to this court is whether or not the Glencoe Park District, organized under the act providing for the organization of park districts, can be held legally responsible for accidents such as the one involved in this proceeding. The park district was created under 'An Act to provide for the organization of park districts and the transfer of submerged lands to those bordering on navigable bodies of water,' Cahill's Ill.Rev.St. ch. 105, § 295 et seq., approved June 24, 1895. Section 14 of the act, as amended in 1929, Cahill's St. ch. 105, § 308, conferred upon the park district, created thereunder, the power to construct equipment and maintain field houses, gymnasiums, assembly rooms, comfort stations, indoor and outdoor swimming pools, wading pools, bathing beaches and a number of other provisions for golf, tennis and other athletic sports. Under the Act, as amended, the park was given the power to make and enforce reasonable rules, regulations and charges therefor. This court had occasion to consider this question in the case of Stein v. West Chicago Park Com'rs, 247 Ill.App. 479, and we there held that the West Chicago Park Commissioners, a municipal corporation, created as it is by the State legislature as a separate entity, and, considering the purpose for which it was organized, namely, for the health, welfare and enjoyment of the general public, is not liable on the ground of respondeat superior for the negligence of its servants and agents. We believe this to be the rule of this State as announced in the cases of West Chicago Park Com'rs v. City of Chicago, 152 Ill. 392 [38 N.E. 697]; Bedtke v. City of Chicago, 240 Ill. App. 493; Holt v. City of Moline, 196 Ill.App. 235; Hendricks v. Urbana Park Dist., 265 Ill.App. 102.

\*   \*   \*   \*   \*   \*

"It is also argued that the present rule is based upon the ancient doctrine that 'the king can do no wrong.' We believe the rule is based upon a broader and more humane theory of government. The purpose of the State in the creation of park districts is primarily to provide for the health, welfare and entertainment of the public. The State could operate without such agencies, but without them the loss would be that of the public. They are not necessary to carry on the functions of government, but their existence is of inestimable benefit to the people. Accidents must, necessarily, happen because of their operation, but the great good to the greatest number greatly outweighs the hardships to the few. The health benefit derived by the general public is of first consideration, and it was evidently this fact which influenced legislatures in the creation of park districts similar to the one involved in this proceeding."

The plaintiffs cite authorities that deal with bailment rights, and there is no question about the theory of plaintiffs, and the law plaintiffs rely upon. However these authorities deal with the legal rights of private individuals, not with immunity rights that have long been applied to governmental municipal corporations such as park districts.

Since the happening of the loss in question, the General Assembly has further amended the Park District Code by incorporating, in 1959, Sec. 12.1, as follows:

"Any park district shall not be liable for any injuries to person or property, or for the death of any person heretofore or hereafter caused by or resulting from the negligence of its agents, servants, officers or employees in the operation or maintenance of any property, equipment or facility under the jurisdiction, control or custody of the park district, or otherwise occasioned by the acts or conduct of such agents, servants, officers or employees."

This amendment merely reiterates the common law on immunity that has been in existence since the early legal history of Illinois. It shows definitely the intention of the General Assembly to keep the common law in force in so far as park districts are concerned, namely that municipal corporations of this type are immune to suits for grievances as so alleged in the complaint.

Accordingly the motion to dismiss the complaint is sustained.